No. 24-2282

In The United States Court Of Appeals
For The Eighth Circuit

ADA MARTINEZ - MEDINA

Appellant

vs.

THOMAS VILSACK, Secretary UNITED STATES DEPARTMENT
OF AGRICULTURE,

APPELLEE.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION

BEFORE THE HONORABLE GARY A. FENNER, U.S. DISTRICT JUDGE

BRIEF OF APPELLANT

Randles Mata, LLC
Rebecca M. Randles #40149
851 NW 45th Street
Suite 310
Kansas City, MO 64116
(816) 931-9901 (816)
931-0134 (FAX)
rebecca@randlesmatalaw.com

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Shouts of "Build That Wall" were directed at Ada Martinez whenever she walked through the door for a period of time at the USDA.  While she settled her discrimination claim based on those events, her managers – who were the discriminating officials in the first claim – never forgot.  After her first EEO claim resolved, these officials continued to discriminate against her – calling her an incompetent female, worthy only of pouring coffee while at the same time, overloading her with work that was above her pay grade.
She was performing GS13 work as a GS9, without the commensurate pay.

Ada Martinez appeals from the grant of summary judgment on her claims against the USDA / FPAC for discrimination based on national origin, race, sex and retaliation.
Ms. Martinez adduced facts that create a prima facie case on each of her claims.

Plaintiff requests 20 minutes of oral argument.

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT
...................... II

TABLE OF CONTENTS
................................................................................................. III

TABLE OF AUTHORITIES
................................................................................................. VI

JURISDICTIONAL STATEMENT
.......................................................................................... 1

STATEMENT OF THE ISSUES FOR REVIEW
................................................................... 2

    A.. The Court Erred in Determining that Plaintiff had not made a Prima Facie

    showing of Disparate Treatment based on race, national origin and sex

    discrimination. ........................................................................................................
    2

    B.    The Court Erred in Determining that Plaintiff had not made a Prima Facie

    showing of a Hostile Work Environment based on race and national origin. ........

    2

    C.    The Court Erred in Determining that Plaintiff had not made a Prima Facie

    Showing of Retaliation. ........................................................................................
    3

STATEMENT OF THE CASE ................................................................................ 4

    WORK ABOVE HER PAY GRADE ............................................... 8

    REASSIGNMENT REQUESTS ...................................................12

    PROPOSED DETAIL ASSIGNMENT ..........................................13

    DELAYED PERFORMANCE REVIEW ........................................14

    ENVIRONMENT ENCOURAGED DEROGATORY COMMENTS .............15

    WAGNER'S PRETEXTUAL DEFENSES ......................................18

    DEMOGRAPHICS OF THE DIVISION ........................................19

    RESULTING HARM .................................................................20

SUMMARY OF THE ARGUMENT ................................................................ 21

ARGUMENT ................................................................................................... 23

  A.  STANDARD OF REVIEW ......................................................23

  B.  Ms. Martinez-Medina Established a Prima Facie Case of Disparate Treatment .........................................................................25

    Elements of a Prima Facie Case .........................................25

Plaintiff's Work Above her Grade

.....................................................................26 Stolen Work Product

.............................................................................31

Refused Reassignments / Transfers

...............................................................32

Other Adverse Actions

.......................................................................34

C.   Ms. Martinez-Medina Established a Prima Facie Case of a Racially and

Sexually Hostile Environment

..............................................................34

D.   Ms. Martinez Medina Established a Prima Facie Case of Retaliation.......40
CONCLUSION

........................................................................................... 47

CERTIFICATE OF SERVICE

............................................................................ 49

CERTIFICATE OF COMPLIANCE

........................................................................ 50



TABLE OF AUTHORITIES

Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) .....................................23

Aucutt v. Six Flags Over Mid-Am., Inc., 85 F.3d 1311, 1317 (8th Cir. 1996) .........27

Bailey v. Runyon, 220 F.3d 879 (8th Cir. 2000). .......................................................32

Bassett v. City of Minneapolis, 211 F.3d 1097, 1098 (8th Cir. 2000). .....................23

Bradley v. Widnall, 232 F.3d 626, 633-34 (8th Cir. 2000)

.......................................35 Brenneman v. Famous Dave's of Am., Inc., 507 F.3d

1139, 1146 (8th Cir. 2007). .40

Brenneman v. Famous Daves of Am., Inc., 507 F.3d 1139 (8th Cir. 2007) ..............
3

Burnett v. Tyco Corp., 203 F.3d 980, 982 (6th Cir. 2000)

.......................................35 Cherry v. Menard, Inc., 101 F. Supp. 2d 1160, 1167

(N.D. Iowa 2000) ................23

Cherry v. Menard, Inc., 101 F.Supp.2d 1160 (N.D.Iowa 2000) ..............................
2

Cummings v. Roberts, 628 F.2d 1065, 1068 (8th Cir. 1980) .....................................27

EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1197 (10th Cir. 2000)

.................................................................................................... 24, 25

El Deeb v. Univ. of Minn., 60 F.3d 423, 428?29 (8th Cir. 1995)
...........................27

Harris v. Forklift Systems, Inc., 510 U.S. 17, 126 L.Ed.2d 295, 114 S.Ct. 367

 (1993). ............................................................................................................... 3

Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 126 L.Ed.2d 295, 114 S.Ct. 367

 (1993) ............................................................................................36

     Hughes v. Stottlemyre, 506 F.3d 675 (8th Cir. 2007) ..........................................3,
                                                                                              39

Hunt v. Cromartie, 526 U.S. 541 (1999) ............................................................2,

24 Jones v. Cargil, Inc., 490 F.Supp.2d 978 (N.D. Iowa 2007).

...................................... 3

Marsh v. Hog Slat, Inc., 79 F.Supp.2d 1068 (N.D. Iowa 2000 ................................
2

Marsh v. Hog Slat, Inc., 79 F.Supp.2d 1068 (N.D. Iowa 2000)
...............................28

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 – 804, 36 L.Ed. 2d 668, 93

     S.Ct. 1817 (1983)
              ..........................................................................25

McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1983)

       ..................................................................................................................
   2

Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66 106 S.Ct. 2399, 91 L.Ed.2d 49

(1986)
......................................................................................................35

Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986) ......................................

3 Mills v. First Fed. Sav. & Loan Ass'n, 83 F.3d 833, 843-44 (7th cir. 1996)

............28

Muldrow v. City of St. Louis, 601 S.Ct. 346, 144 S.Ct. 967, 218 L.Ed.2d 322

(2024). ......................................................................................................31

Muldrow v. City of St. Louis, 601 U.S. 346, 144 S.Ct. 967, 2189 L.Ed.2d 322

(2024). ......................................................................................................
2

National Railroad Passenger Corp. v. Morgan,  536 U.S. 101, 122 S.Ct. 2061, 153

L.Ed.2d 106 (2002). ......................................................................................
3 National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 114, 122 S.Ct.
2061,

153 L.Ed.2d 106 (2002). ......................................................................35

National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 114-115, 122 S.Ct.

2061, 2073 (2002) ......................................................................36

National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S.Ct. 2061,

2073 (2002). ...................................................................... 36, 37

Reeves v. Sanderson Plumbing, Inc., 530 U.S. 133, 150 (2000)
............................23

Reeves v. Sanderson Plumbing, Inc., 530 U.S. 133, 150 (2000) ;
...........................23

Reeves v. Sanderson Plumbing, Inc., 530 U.S. 133, 150 (2000). ..............................

2 Sam's Riverside, Inc. v. Intercon Solutions, Inc., 790 F. Supp. 2d 965, 975 (S.D.

   Iowa 2011) ....................................................................................................30

Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981) ..............25

Thomas v. Eastman Kodak Co., 183 F.3d 38, 59 (1st Cir. 1999) ............................45

Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). .....................30

Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir.1994) ........................... 24, 25

Wilking v. County of Ramsey, 153 F.3d 869, 873 (8th Cir. 1998). .........................24

Young v. Warner – Jenkinson, 152 F.3d 1018 (8th Cir. 1998) ................................... 2

Young v. Warner-Jenkinson, 152 F.3d 1018, 1022 (8th  Cir. 1998)

.........................25 Young v. Warner-Jenkinson, 152 F.3d 1018, 1022 (8th Cir. 1998)

.........................24

Statutes
42 U.S.C. § 2003-2(a)
.............................................................................................36

42 U.S.C. § 2003-5(e)(1)

.............................................................................................36

Rules

Fed. R. Civ. P. 56(c
.............................................................................................23

Fed. R. Civ. P. 56(c)(4); Fed. R. Civ. P. 56(e)(1) (2010) .........................................27

Fed. R. Evid. 602 ...................................................................................27

Treatises

10 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2712

  (3d ed. 1998) ...........................................................................................30

9A C. Wright & A. Miller, Federal Practice and Procedure, 2529 (2d Ed. 1995) 24

## JURISDICTIONAL STATEMENT

A.  This case arises under Title VII, conferring federal jurisdiction upon the lower court pursuant to 28 U.S.C. § 1331.

B.  The Court has jurisdiction pursuant to 28 U.S.C. § 1291.

C.  The Honorable Judge Fenner, United States District Court for the Western District of Missouri, granted Defendant USDA / FPAC Motion for Summary Judgment on April 23, 2024. Ms. Martinez filed her Notice of Appeal on June 21, 2024.

D.  This appeal is from a final order or judgment that disposes of all parties' claims.

## STATEMENT OF THE ISSUES FOR REVIEW

A.    Standard of Review

De novo review is appropriate in this case, as it comes before the Court

following the grant of Summary Judgment pursuant to Defendant's Motion for

Summary Judgment.

Reeves v. Sanderson Plumbing, Inc., 530 U.S. 133, 150 (2000).

Cherry v. Menard, Inc., 101 F.Supp.2d 1160 (N.D.Iowa 2000)

Hunt v. Cromartie, 526 U.S. 541 (1999)

B.    The Court Erred in Determining that Plaintiff had not made a Prima

Facie showing of Disparate Treatment based on race, national origin and sex

discrimination.

Young v. Warner – Jenkinson, 152 F.3d 1018 (8th Cir. 1998)

McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668

(1983)

Marsh v. Hog Slat, Inc., 79 F.Supp.2d 1068 (N.D. Iowa 2000).

Muldrow v. City of St. Louis, 601 U.S. 346, 144 S.Ct. 967, 2189 L.Ed.2d
322

(2024).


C.    The Court Erred in Determining that Plaintiff had not made a Prima

Facie showing of a Hostile Work Environment based on race and national origin.

Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986)

National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

Harris v. Forklift Systems, Inc., 510 U.S. 17, 126 L.Ed.2d 295, 114 S.Ct. 367 (1993).

A.      The Court Erred in Determining that Plaintiff had not made a Prima Facie Showing of Retaliation.

Hughes v. Stottlemyre, 506 F.3d 675 (8th Cir. 2007)

Brenneman v. Famous Daves of Am., Inc., 507 F.3d 1139 (8th Cir. 2007) Jones v. Cargil, Inc., 490 F.Supp.2d 978 (N.D. Iowa 2007).

## STATEMENT OF THE CASE

Within the USDA lies its operational component Farm Production and Conservation ("FPAC") which includes the agencies the Farm Service Agency, the Natural Resources Conservation Service, the Risk Management Agency, and the Farm Production and Conservation Business Center.  [APP. 00196; R.Doc. 39 at 6]. The Farm Production and Conservation Business Center ("FPAC-BC"), combines employees from all three FPAC agencies into specialized teams that serve employees and customers across the Farm Service Agency, the Natural Resource

Conservation Service, and the Risk Management Agency by utilizing a business approach that helps these agencies improve operations and efficiency at the USDA and boosts support for America's farmers, ranchers, and foresters. [App. 00196; R.Doc. 39 at 6].

The FPAC-BC is responsible for financial management, budgeting, human resources, information technology, acquisitions/procurement, customer experience, internal controls, risk management, strategic and annual planning, and other similar activities for the FPAC and its component agencies. [App. 00196; R.Doc. 39 at 6]. The FPAC-BC has its headquarters in Washington, D.C. and has regional offices located in Kansas City, Missouri, Raleigh, North Carolina, Fort Worth, Texas, and Fort Collins, Colorado. [App. 00196; R.Doc. 39 at 7].

Ada Martinez-Medina, is a Hispanic female of Puerto Rican descent. She began working at FPAC-BC in Kansas City in September of 2016 as an Information Security IT Specialist. [App. 00197; R.Doc. 39 at 7]. Ms. Martinez began her employment with the FPAC-BC at the GS-05 level but was promoted to a GS-07 (in 2017) and later (during the time relevant to this lawsuit) to a GS-09 (in 2018).[1] [App. 00197; R.Doc. 39 at 7].

---

[1] Martinez-Medina is currently a GS-12.

From September of 2016 through August of 2019, Ms. Martinez had eight supervisors: Jeff Wagner, Kendall Kukowski, Charles Cornelius, Sudhir Nellutla, Michael Sheaver, Cynthia Towers, Carraig Stanwyck and Bryan Brooke. [App. 00213; R.Doc. 39 at 23]. Jeff Wagner was the Chief Information Security Officer, Information Assurance Branch Chief. He supervised everyone in the Information Security Division (ISD). [App. 00213; R.Doc. 39 at 23].

Despite his denials in his EEO affidavit, Wagner always knew Ada to be Hispanic. He hired her through a program called Pathways which is for students and veterans who want to enter the Federal job sector. [App. 00213; R.Doc. 39 at 23]. Wagner also acknowledged that she is Hispanic in an email letter to the Human Resources Department. [App. 00213; R.Doc. 39 at 23].

---

Martinez alleges discrimination based on reprisal as she filed a prior EEO claim in 2017. [App. 00213; R.Doc. 39 at 23]. She filed that claim over the behavior of two contract employees who subjected her to racial slurs and her supervisor for allowing that behavior to continue unabated for approximately three months. [App. 00213; R.Doc. 39 at 23]. Jeff Wagner was one of the supervisors who allowed the behavior to continue; he was named as the discriminating / responding management official in that complaint. [App. 00213; R.Doc. 39 at 23].

In the Summer of 2017 and later in 2018, Martinez-Medina initiated EEO complaints [FSA 2017-00850 and FSA 2018-00601, respectively] involving Martinez-Medina's allegations of discrimination, harassment, hostile work environment, and retaliation in the workplace specifically including allegations that two contractors hired by the USDA made degrading comments to and in front of Martinez-Medina (using terms such as "spic" and "beaner" to describe her and other people of Hispanic descent) and alleging that her USDA supervisors additionally discriminated and retaliated against her and exposed her to a hostile work environment. [App. 00198; R.Doc. 39 at 8]. Subsequently, in August of 2018, Martinez-Medina entered into a settlement agreement with the USDA wherein Martinez-Medina settled "any and all alleged employment discrimination concerns," including claims raised in the informal complaint in Case No. FSA2018-00601/KC-18-005E; claims raised in the formal complaint in Case No. FSA201700850, and any other claims "concerning [Martinez-Medina's] employment with the agency through [August 15, 2018]." [App. 00198; R.Doc. 39 at 8].

Ms. Martinez has alleged that the harassment did not stop with the August 15, 2018 settlement but continued thereafter. She filed another complaint of discrimination initiating informal counseling on December 17, 2018 and timely filing her formal complaint of discrimination on March 27, 2019. [App. 00199;

R.Doc. 39 at 9].  Ada's formal complaint is six pages long and outlines numerous events of discrimination and harassment.  [App. 00338-00343].  She also attached numerous supporting documents to her EEO complaint in order to show the continuing pattern.  [App. 00345 – 00372; R.Doc. 39 at 11-38]  The Agency condensed her complaint and accepted for investigation the following:

> On unspecified dates, Martinez-Medina's supervisor assigned her work duties at the GS-13 performance level, which were above Martinez-Medina's GS-09 position, and outside of her position description;

> On unspecified dates, Martinez-Medina's supervisor denied her requests for reassignment;

> On several dates, she was subjected to various incidents of harassment including but not limited to:

> On December 12 2018, management failed to prevent her colleague from making the offensive and derogatory comments, such as she is an "incompetent woman: and "the only thing she can do is fetch coffee; and being called a "spic"; and

On an unspecified date, her supervisor attempted to manipulate her to accept a detail assignment in an effort to silence her complaints.

In November/December of 2018, Martinez-Medina's annual performance evaluation was delayed;

## WORK ABOVE HER PAY GRADE

Ada began as a GS5 level employee in September 2016. By 2018, she had become a GS9 level employee. [App. 00214; R.Doc. 39 at 24]. Her co-workers describe Martinez as "smart as hell, eager to please, quick to learn and a team player." [App. 00214; R.Doc. 39 at 24]. From the time she started, Jeff Wagner gave her assignments over her pay grade. [App. 00214; R.Doc. 39 at 24]. All of the projects go through the second level supervisor, Jeff Wagner. He makes the decisions regarding how to allocate the work. [App. 00214; R.Doc. 39 at 24]. From the date she was hired, Charlene Niffen saw the work she was assigned. Ada was routinely given work that was outside of her job description and her pay grade. [App. 00214; R.Doc. 39 at 24]. Charlene Niffen questioned Jeff Wagner about Ada being required to handle GS12 and 13 work. His response was that may be the GS12s and GS13s were doing GS7 work. He totally dismissed the concern. [App. 00214; R.Doc. 39 at 24]].

Ms. Niffen saw Wagner taking advantage Ada. He took Ada's work product and used it as his own. He would give her assignments and she would go out on the projects, do all of the work, gather the documents and supporting research, put the presentation together then Wagner would claim that the work was his own. [App. 00214; R.Doc. 39 at 24]. Wagner's pressure on Ms. Martinez increased after she became a GS9. For example, Wagner dumped much of the security training work (videos) on Ms. Martinez. She had no knowledge of how to do this so Ms. Martinez went to Niffen and asked for recordings of Niffen's training. She did very complex Standard Operating Procedure training videos. These were GS 13 work. [App. 00214-00215; R.Doc. 39 at 24-25].

Ada Martinez also created a PII training video and a PII notice that was assigned to a GS13. Ms. Martinez received no recognition for this work. [App. 00215; R.Doc. 39 at 25]. As for the PII notice, the FPAC Notice Handling and Storage of PII required Ms. Martinez to contact and communicate with leadership at the SES (Executive) level. However, Wagner gave a counseling to Martinez for doing that, instructing her that she was not supposed to speak to people at that level; it was reserved for Wagner. [App. 00215; R.Doc. 25].

Cynthia Towers, one of Martinez's supervisors, explains that Ada was tasked with putting together training models. It was Cynthia's understanding for awhile that Ada was responsible for putting together the training but was not allowed to

give it because she is a GS9.  [App. 00215; R.Doc. 25].  Towers testified that Ada

is "above and beyond great at doing training."  [App. 00215;

R.Doc. 25].  Towers recognized that Ada was doing work that is not GS9; she told

Ada it was an opportunity to go above and beyond and showcase her talent.  [App.

00215; R.Doc. 39 at 25].

When Niffen retired from the Agency, Ada took over her responsibilities as a

GS13. her responsibilities were to look over the contractors work to make sure

their deliverables were acceptable so we could pay them.  [App. 00215; R.Doc. 39

at 25].  Wagner put a lot of pressure on Ada.  People would dump things on her

when they could not get the assignments done themselves.  Jeff Wagner leaned on

her for assignments as Ada was very meticulous in her work.  However, she never

got the credit for that work. [App. 00215-00216; R.Doc. 39 at 25-26].

When Niffen broached the subject of Ada working above her pay grade with

Wagner, he dismissed them saying that a lot of employees did work above their

grade level.  [App. 00216; R.Doc. 39 at 26].

Niffen saw differences in Wagner's treatment of Ada.  She believes it had to

do with her prior complaints as she was the only person getting bizarre assignments

above her pay grade.  [App. 00216; R.Doc. 39 at 26].  In addition to taking over the

GS13 duties of Niffen when she retired, Ms. Martinez also took over the SLR

duties and Information Security Awareness duties of Seabelle Ball, also a GS13. [App. 216; R.Doc. 39 at 26].

Ada began asking for a Position Description but Wagner never provided one. [App. 00216; R.Doc. 39 at 26]. The only document given to Ms. MartinezMedina was a "Statement of Difference." It was not a description of the GS9 position. In order to determine whether Ms. Martinez was performing at a GS9 or GS1 level, it would have been necessary to document and assign numerical values to her actual job duties. [App. 00202; R.Doc. 39 at 12]. Wagner did not accrete duties to Ms. Martinez; he gave her duties that he claimed for his own. [App. 00202-00203; R.Doc. 39 at 12-13].

Martinez believes she was given extra and higher grade work without being paid for it as a form of retaliation for her prior EEO activity. [App. 00216; R.Doc. 39 at 26]. The others who performed the same duties as Ms. Martinez but were paid higher compensation include: Charlene Niffen, GS13; Seabell Ball, GS13; William Lawson, GS13; Darren Nash, GS13; Roxanne Barbe, GS11; Barbara Mills, GS12. None of them are of Hispanic descent. [App. 216; R.Doc. 39 at 26].].

REASSIGNMENT REQUESTS

Following the settlement of her prior claims, the harassment of Ms. Martinez did not end. As a result, she requested reassignment. [App. 217; R.Doc. 39 at 27].

11

After Ms. Martinez's first complaint of discrimination, Donald Butler asked that Ada be transferred to his department. [App. 00217; R.Doc. 39 at 27]. Butler and Felicia Harper devised a plan and went to Jeff Wagner about the potential transfer. Wagner approved it. [App. 00217; R.Doc. 39 at 27]. The reassignment was first presented as being a pay decrease of approximately $20,000 per year but Ms. Martinez was willing to take it in order to get out of the hostile environment. [App. 00217; R.Doc. 39 at 27]. Butler had a meeting with Wagner, Darren Ash and Human Resources Department [HRD]. All approved the reassignment. [app. 00217; R.Doc. 39 at 27]. Butler then discovered he could accept Martinez into his department under a "Management Directive" transfer which would result in a lateral move and no pay decrease. [App. 00217; R.Doc. 39 at 27]. On the date of execution to process Ada's SF52 – the paperwork required to effect the transfer – Jeff Wagner sent an email to Donald Butler telling him not to contact Wagner again about the subject; he said he would let Butler know when and if he was ready to discuss it. [App. 00217; R.Doc. 39 at 27]. Wagner later told Butler he had decided not to agree to the transfer. [App. 00217; R.Doc. 39 at 27]. If Wagner had agreed to the transfer, Martinez would have lost a little money in the short term but the position had a GS13 grade potential and Butler would have promoted her along that career path. [App. 00217; R.Doc. 39 at 27.]. Ms. Martinez became a GS12 on or about September, 2022. The GS12 was granted her approximately 4 years after

the Butler opportunity passed.  [App. 00218; R.Doc. 39 at 28]  Ms. Martinez has requested other transfers as well but Wagner has denied them all.  [App. 00218; R.Doc. 39 at 28].

PROPOSED DETAIL ASSIGNMENT

On or about the end of March, 2019. Jeff Wagner attempted to place Ms. Martinez on a detail assignments in Homeland Security.  [App. 00218; R.Doc. 39 at 28].  The detail was framed as a way for Ms. Martinez to learn new skills.  [App. 00218; R.Doc. 39 at 28].  Ms. Martinez had previously gained those skills when she worked for the Agency as a contractor.  [App. 00218; R.Doc. 39 at 28].  The Detail would have been for 90-120 days.  [App. 00218; R.Doc. 39 at 28].  In the past, Wagner had slow walked Plaintiff's performance review which prevented her from applying for other positions.  [App. 00218; R.Doc. 39 at 28].  Ada feared that the detail would adversely impact her performance review and hold her back from advancing.  [App. 00218; R.Doc. 39 at 28].  Additionally, Martinez came to the agency under the "Pathways" program that gave her a bump in pay.  She was concerned that the 90-120 day gap in service would affect her Pathways income.  [App. 00218; R.Doc. 39 at 28].  Martinez believed that the detail was a way of just getting rid of her because of her complaints.  [Ex. 1, Martinez Aff. ROI 000096].

Cynthia Towers, one of Plaintiff's supervisors, knew that Jeff Wagner was tired of dealing with Ada and wanted her gone.  [App. 00219; R.Doc. 39 at 29].

Wagner also approached Towers and suggested that a strong female manager might help with "Ada's issues." [App. 00219; R.Doc. 39 at 29].

DELAYED PERFORMANCE REVIEW

Following Plaintiff's First complaint of discrimination and as part of the settlement of it, she was to be placed under Sudhir Mellutla as her supervisor. [App. 00219; R.Doc. 39 at 29]. Kendall Kukowski had been her prior supervisor and his review for the 2018 Fiscal Year reporting period had inaccurate and inappropriate information in it. [App. 00219; R.Doc. 39 at 29]. Wagner was instructed by leadership and EEO officials to go to HRD and have these false statements removed. [App. 00219; R.Doc. 39 at 29]. At the time of the review, Sudhir knew nothing about the projects Ada was working on and anything else she was doing, so everything was supposed to go through Mr. Wagner. [App. 00219; R.Doc. 39 at 29]. Martinez repeatedly asked Wagner about her performance evaluation; and he in turn repeatedly blamed Sudhir. [App. 00219; R.Doc. 39 at 29]. Cynthia Towers became Ada's supervisor in approximately October 2018. As of October, the performance evaluation was not done; it should have been done in September. [App. 00219; R.Doc. 39 at 29].

Reviews are due in September and gone over and signed in October so employees can receive their year-end bonuses by the end of the year. [App. 00219; R.Doc. 39 at 29]. Policy was not followed as it was very late and the review was

poorly done.  A lot of comments had nothing to do with Ada's performance.  [App. 00219-00220; R.Doc. 39 at 30].  As a result of the lateness of her performance appraisal, Ms. Martinez performance award for her Outstanding performance review was delayed until February 2019.  [App. 00207; R.Doc. 39 at 17].

## ENVIRONMENT ENCOURAGED DEROGATORY COMMENTS

Ms. Martinez filed an EEO complaint prior to the one at issue in this lawsuit. The allegations of the previous complaint included the following:

  a. Her coworkers invited her into their cubicle to discuss Spanish English translation and in the conversation made racial slurs.

  b. Those racial slurs included calling Hispanics beaners, half beaners and spics.

  c. The coworkers told her they were tired of catering to minorities like

  LGBTs and Mexicans;

  d. They expressed their dislike of Spanish news reporters and how they speak;

  e. They mocked Mexicans who do not speak English by mocking their smile and shaking their heads;

  f. They said they wanted to use the word "retarded" as it was used in the past;

g. They asked Ms. Martinez – Medina why it was okay for Trump to say build that wall and not us;

h. They changed "Trump, Trump, Trump build that wall" when she walked by;

i. They asked if they could call her "spic" since they were friends;

j. They commented that they were using Spic and Span to clean their desks and made other remarks about Spic and Span;

k. They named the database on which Ms. Martinez worked "Nacho Migration."

[App. 220; App. Vol. 2, at 221; R.Doc. 39 at 31-32].

These types of comments were going on for over three months on a regular and daily basis. Despite her complaints, nothing was done by Wagner for that intervening period. [App. 00221; R.Doc. 39 at 31]. After that complaint, Ada was viewed as the "problem employee." [App. 00221; R.Doc. 39 at 31]. Her belief that she was viewed as the one having the problem was borne out by the testimony of Cynthia Towers who explained that Wagner wanted Ada gone or have a strong female supervisor over Ada to perhaps assist with "Ada's issues." [App. 00221; R.Doc. 39 at 31].

Towers observed sexism among the supervisors. The men in the group took care of the men. [App. 00221; R.Doc. 39 at 31]. There were a lot of comments

made by Wagner in manager's meetings where he forgot Towers was female. There were innuendos about "girls and their hysterics" for example. [App. 00221; R.Doc. 39 at 31].

Towers observed Wagner treating Ada differently. For example, he threatened to write her up for being over one minute late for work. [App. 00221; R.Doc. 39 at 31].

On December 12, 2018, Ms. Martinez was in a meeting called by Charlene Niffen with respect to job assignments. [App. 00221; R.Doc. 39 at 31]. According to Niffen, the meeting was cordial and without dissension. But then Carraig Stanwyck, a lead, was asked by Charlene what Ada's best role would be to assist her in the project. He responded that she could bring Charlene coffee. [App. 00221; R.Doc. 39 at 31] Tasha Middleton said "Wow. That's really messed up." [App. 00221; R.Doc. 39 at 31].

Ada became visibly upset, embarrassed and humiliated. [App. 00222; R.Doc. 39 at 32]. Ada said she was going to document what was said. [App. 00222; R.Doc. 39 at 32]. Carraig turned to head out to Mr. Wagner's office but tripped on Tasha's laptop power cord. He said "why don't you document that." [App. 00222; R.Doc. 39 at 32].

Ada arrived at Wagner's office after Carraig and waited her turn outside the door. While sitting and waiting, she could hear Carraig and Wagner carrying on,

laughing and mocking her. [App. 00222; R.Doc. 39 at 32]. Wagner told Carriag how he needed to "handle" Martinez and said that Martinez was an incompetent woman. [App. 00222; R.Doc. 39 at 32]. Wagner made fun of Martinez because he had to email her a link on how to follow the proper chain of command. [App. 00222; R.Doc. 39 at 32]. Carraig, who has Aspberger's and is not always socially aware, was counseled by Cynthia Towers. [App. 00222; R.Doc. 39 at 32]. Wagner's response to Carraig's outburst as well as the sexist tone in the division, cultivated an environments that allowed or condoned these behaviors. [App. 00222; R.Doc. 39 at 32]. No further discipline was meted out and Carraig was later promoted to become Ms. Martinez's supervisor. [App. 00222; R.Doc. 39 at 32]. Ms. Martinez feels like she is treated like a Hispanic maid or servant rather than an equal. [App. 00222; R.Doc. 39 at 32]. The comments made part of the prior EEO as well as the continuing acts and comments made part of this claim are clearly made about Ms. Martinez's sex and national origin. [App. 00222; R.Doc. 39 at 32].

## WAGNER'S PRETEXTUAL DEFENSES

Wagner testified that Ada had acted "insubordinate" at the assignment meeting called by Charlene Niffen which prompted Carraig's response. [App. 00223; R.Doc. 39 at 33]. Niffen has testified that the meeting was cordial and without dissension up until the time that Carraig made the "coffee" comment.

[App. 00223; R.Doc. 39 at 33] .

Wagner has also accused Complainant of causing "an uncomfortable and difficult work environment for the management team." [App. 00223; R.Doc. 39 at 33]. The example he gives is that Plaintiff was reassigned from one supervisor – which was done as part of the EEO settlement process to move her away from a supervisor that allowed months of remarks such as spic, beaner, and build that wall to be hurled at her. [App. 00223; R.Doc. 39 at 33].

DEMOGRAPHICS OF THE DIVISION

There is a culture of white men in supervisor or lead roles directed by Mr. Wagner all of which have higher pay grades and have allocated work assigned from Mr. Wagner to Ms. Martinez. [App. 00223; R.Doc. 39 at 33]. The culture is white male dominated and comments such as Ms. Martinez is an incompetent woman, good only for making coffee as well as others shows gender based animus. [App. 00223; R.Doc. 39 at 33]. The Workforce Profile for the FPAC-BC Information Assurance Engineering and Planning group as of December 2018 reflects a total of 12 employees, including the Complainant. Of the 12 employees, eight (66%) are white, two (16%) are Hispanic, one (8%) is black and one reflects two or more national origins. Of the 12 employees, three or 25% are reflected as female while eight (75%) are male. Only Plaintiff and Wagner have had prior EEO activity. [App. 00223-24; R.Doc. 39 at 33-34].

## RESULTING HARM

Ms. Martinez reports having suffered deleterious psychological effects. The stress takes her away from her family, her children and her ability to perform her job. The situation has caused her so much anxiety, mentally, emotionally and even physical stress symptoms. She cannot sleep at night; her mind keeps worrying while counting the hours until she has to head into work to face another day of walking around on eggshells, she has lost trust in the department. What is really hard to deal with is how this issues is adversely affecting other important aspects of her life, including her family and especially her children. [App. 00224; R.Doc. 39 at 34]. Ms. Martinez would have received her 11 and 12 earlier and would have received her 13 already if she had been allowed to transfer. [App. 00224; R.Doc. 39 at 34].

## SUMMARY OF THE ARGUMENT

Ada Martinez – Medina is a superstar at the U.S.D.A. Described as "bright as hell" and a recipient of multiple awards and outstanding reviews, Ada is and has been an exemplary employee. Despite her excellence, she experienced months of disgusting harassment based on her Hispanic national origin. She was called a

spic, a beaner, told to go back where she came from and USDA contractors yelled "build that wall" every time she walked past. She settled those complaints. But, her supervisor – who had done nothing regarding these events for months – remained. Even after the settlement agreement was signed, he continued singling out, harassing and creating a hostile work environment for Ms. Martinez – Medina. He allowed her to be called names, he called her incompetent, hysterical, a woman with "issues" and admitted to the other supervisors that he wanted her out. He also recognized her brilliance because he gave her his work and the work of others way above her pay grade – she was a GS9 at the time and he gave her GS13 work and above. Then he took credit for the work, presenting it as his own while making her feel as if she were the Hispanic maid. Ms. Martinez suffered tangible adverse employment actions including the loss of pay, delayed awards and delayed advancement. She also suffered significant emotional distress and injury that caused her to seek counseling. The Court erred in granting Summary Judgment to defendants. It also erred in granting summary judgment on the Retaliation claim that was never argued by the defense.

Plaintiff made a prima facie case on all of her claims of discrimination.

<u>ARGUMENT</u>

A. Legal Standards

. De novo review is appropriate in this case, as it comes before the Court following the grant of Summary Judgment pursuant to Defendant's Motion for Summary Judgment. Reeves v. Sanderson Plumbing, Inc., 530 U.S. 133, 150 (2000); Cherry v. Menard, Inc., 101 F.Supp.2d 1160, 1167 (N.D. Iowa 2000); Hunt v. Cromartie, 526 U.S. 541 (1999).

Summary judgment should be granted only where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The EEOC is obliged to view the facts in the light most favorable to the Complainant and draw all inferences in his favo Reeves v. Sanderson Plumbing, Inc., 530 U.S. 133, 150 (2000) ; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Bassett v. City of Minneapolis, 211 F.3d 1097, 1098 (8th Cir. 2000). These requirements are to be applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues. Cherry v. Menard, Inc., 101 F. Supp. 2d 1160, 1167 (N.D. Iowa 2000)(collecting cases holding that summary judgment should seldom be used in employment discrimination cases); Bassett, supra at 1098.

Even when the facts are not in dispute, summary judgment should be denied if competing inferences can be drawn from the undisputed facts on material issues. Hunt v. Cromartie, 526 U.S. 541 (1999). Thus, if the Agency's evidence is contradicted, or comes from an interested witness, it cannot be credited unless it is favorable to the Plaintiff. Reeves, 530 U.S. at 151, quoting 9A C. Wright & A. Miller, Federal Practice and Procedure, 2529 (2d Ed. 1995) at 300.

Here Plaintiff has established issues of fact regarding each element of her claims, creating a prima facie case. Wilking v. County of Ramsey, 153 F.3d 869, 873 (8th Cir. 1998).

The burden imposed on a plaintiff at the prima facie stage is "not onerous." EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1197 (10th Cir. 2000), quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). The required proof necessary to establish a prima facie case for a Title VII claim on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir.1994) Young v. Warner-Jenkinson, 152 F.3d 1018, 1022 (8th Cir. 1998) (the prima facie burden is not so onerous as, nor should it be conflated with, the ultimate issue of discriminatory action).

Because Plaintiff has established a prima facie case of discrimination based on national origin, race, sex, and retaliation, summary judgment should be overruled.

B.      Ms. Martinez-Medina Established a Prima Facie Case of
        Disparate Treatment

Elements of a Prima Facie Case

The burden imposed on a plaintiff at the prima facie stage is 'not onerous.'"
EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1197 (10th Cir. 2000), quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981)
The required proof necessary to establish a prima facie case for a Title VII claim on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir.1994); Young v. Warner-Jenkinson, 152 F.3d 1018, 1022 (8th Cir. 1998)(the prima facie burden is not so onerous as, nor should it be conflated with the ultimate issue of discriminatory action).

Employment discrimination cases are evaluated under the framework of the McDonnell-Douglas burden shifting analysis.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 – 804, 36 L.Ed. 2d 668, 93 S.Ct. 1817 (1983).  The first step in the analysis places the burden of production on the plaintiff to establish a prima facie case of discrimination by showing that: (1) she is a member of a

protected class; (2) she satisfactorily performed the duties of the job; 3) she suffered an employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination on the basis of membership in the protected class. Id.

Plaintiff as a Hispanic female is a member of a protected class. She satisfactorily performed the duties of her job as is apparent through her job evaluations. She is considered "smart as hell" and received the highest possible rating – Outstanding – on her performance review. [App. 00214; R.Doc. 39 at 24; App. 00207; R.Doc. 39 at 17].

Ms. Martinez alleged a number of events that were discrete discriminatory acts directed at her. The lower court analyzed Plaintiff's Duties Above Pay Grade, Wagner's taking her work product as his own; his refusal to reassign or transfer Ms. Martinez – Medina and determined that they did not establish a prima facie case of discrimination. The Court erred in its analysis on two separate grounds: 1). It misconstrued the facts alleged by the parties; 2). It failed to take into consideration other acts of discrimination – even though they appear in the Court's recitation of facts.

### Plaintiff's Work Above her Grade

Wagner cavalierly assigned duties to Ms. Martinez – Medina. He was directly approached by two other supervisors about his treatment of Ms. Martinez,

specifically regarding his giving her above grade level assignments. [App. 00203; R.Doc. 39 at 13]. The Court first dismisses the affidavits of Plaintiff's former supervisors as "conclusory." Neither affidavit presented is "conclusory" as each contains the necessary elements to support the matters presented.

An affidavit used to oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); Fed. R. Civ. P. 56(e)(1) (2010) ("A supporting or opposing affidavit must be made on personal knowledge . . . and show that the affiant is competent to testify on the matters stated."); see also Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). "In evaluating evidence related to possible summary judgment, a court may not consider affidavits that do not satisfy" the personal knowledge requirement of Rule 56. Aucutt v. Six Flags Over Mid-Am., Inc., 85 F.3d 1311, 1317 (8th Cir. 1996) (citing El Deeb v. Univ. of Minn., 60 F.3d 423, 428?29 (8th Cir. 1995) and Cummings v. Roberts, 628 F.2d 1065, 1068 (8th Cir. 1980).

The affidavits of Niffen and Towers meet these requirements. Both are members of the supervisory and management teams. As such, they had personal knowledge of the duties given to Ms. Martinez and that those differed from other

GS9 specialists.  Both, as members of the supervisory and management teams, recognized that Ms. Martinez was given specific GS13 level duties that had previously been handled by GS13 level employees.  She took over all of the duties of Seabelle Ball and Ms. Niffen when she retired.  Both watched as Wagner put more and more pressure on Ms. Martinez.  Ms. Towers counseled Ms. Martinez that taking on the higher responsibilities would give her greater visibility and help her career in the long run.  [App. 00215; R.Doc.  25].  Thus, both of these supervisory employees knew from their experience as supervisors that Ms. Martinez was performing GS13 level functions.

These affidavits cannot be dismissed out of hand as conclusory.  Both Affiants were in a position to observe both management and Plaintiff, they have averred that they did observe them and that their evidence concerning the facts set forth in their affidavits is made on personal knowledge.  See Marsh v. Hog Slat, Inc., 79 F.Supp.2d 1068 (N.D. Iowa 2000).  Likewise, Plaintiff's affidavit informing the court that she took over all of the duties of two GS13 level employees is based upon her personal knowledge.  As Ada's affidavit is in compliance with Rule 56(e), it may even standing alone, generate genuine issues of material fact sufficient to defeat summary judgment.  See Mills v. First Fed. Sav. & Loan Ass'n, 83 F.3d 833, 843-44 (7th cir. 1996).

The Court suggests that because Wagner did not provide position descriptions broken down by pay grade, the Plaintiff cannot prevail on her claim

that she was required to perform Grade 13 work at Grade 9 compensation levels. The Court over extrapolates from the evidence offered. First, that Ms. Martinez was capable of handling the overburdening of work on her establishes not that she was performing Grade 9 work, but that she was outstanding as an employee. Ms. Towers indicated that she asked Plaintiff to do some of the Grade 13 work. But, her affidavit makes it clear that she understood she was asking Ms. Martinez to perform higher level work that would showcase her skills. [App. 00215; R.Doc. 39 at 25]. She also recognized that Wagner took these assignments to new heights – assigning her work for which he himself as a much higher grade employee, took credit. [App. 00214; R.Doc. 39 at 24; App. 00284; R.Doc. 39-3 at 2]. Certainly, he would not take credit for GS9 level work at his level.

The Court also combed through the evidence to determine that since Wagner placed some limits on Ms. Martinez's work by preventing her from presenting the trainings that she had developed, that she was not performing Grade 13 work. [App. 00430, R.Doc. 42 at 14]. Another more reasonable inference would be that Wagner prevented Ms. Martinez from giving the training she developed to claim it as his own. The testimony from Ms. Niffen and Ms. Martinez was that Wagner would have Martinez-Medina pull together the documents, the research, the data and the materials he requested then he would take credit for that work. [App.

00214; R.Doc. 39 at 24; App. 00284; R.Doc 39-3 at 2].

The Court erred in making a credibility determination about the relative testimony of the parties. "Courts do not treat summary judgment as if it were a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). In a motion for summary judgment, the Court's job is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial.See id. (citing Anderson, 477 U.S. at 249 and 10 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2712 (3d ed. 1998))." Sam's Riverside, Inc. v. Intercon Solutions, Inc., 790 F. Supp. 2d 965, 975 (S.D. Iowa 2011).

The Court next argues that even if Wagner assigned work outside her pay grade, Plaintiff cannot show harm. Again, the Court errs. First, Plaintiff established that she was emotionally and mentally harmed by the overload of work. [App. 00224; R.Doc. 39 at 34]. Additionally, Ms. Martinez-Medina was financially burdened as she was being required to work at a GS13 while being paid as a GS9. She missed the pay difference between the two positions. She would have been promoted sooner. [App. 00224; R.Doc. 39 at 34]. This financial burden is a "harm." The Court did not have the Supreme Court's guidance in Muldrow v. City of St. Louis, 601 U.S. 346, 144 S.Ct. 967, 218 L.Ed.2d 322 (2024). Muldrow

drops the bar in employment discrimination cases. There is no longer a significant harm requirement to be successful in Title VII litigation. A plaintiff only need show "some injury respecting her employment terms or conditions." Id. at 971. Finally, both Ada and her witnesses have testified that Wagner put more and more pressure on Ada to perform these duties outside her pay grade (and for which she had not been trained). The pressure he placed on her caused her emotional distress and harm. These allegations are sufficient to establish that the additional and higher duties caused her harm. Id.

Stolen Work Product

In her affidavit, Niffen states as follows: "Ada was taken advantage of by Jeff Wagner. He took her work product and used it as his own. He would give her assignments and she would go out on the projects, do all the work, gather the documents and supporting research, put the presentation together and then Jeff would claim that the work was his own. [App. 00285; R.Doc. 39-3 at 2-3]. There is no question that Wagner claimed the work that Ada had done as his own. The harm comes from the lack of visibility. Being engaged in high profile projects creates upward mobility in the USDA. [App. 00215; R.Doc. 39 at 25]. Wagner's claiming responsibility for Ms. Martinez – Medina's work prevented her from receiving the credit that would assist her in her upward mobility. His stealing of her work product also caused her severe emotional distress, which is another form

of harm for which damages can be given.  See Bailey v. Runyon, 220 F.3d 879 (8th Cir. 2000).

Refused Reassignments / Transfers

In 2018, Ada was given the opportunity to transfer to Donald Butler's team in FPAC.  The original opportunity was provided to Wagner in approximately April of 2018, certainly before the settlement agreement purporting to release claims for all events occurring before December.  However, the events did not conclude until after the settlement agreement was signed.  Butler continued his communication with Wagner until Wagner told him, essentially, to quit calling.  Wagner never followed up with Butler after he discovered that Butler could give the position to Ada without Ada taking a serious pay decrease.  Once that became clear, Wagner withdrew his approval of the position with Ada and refused to discuss the position with Butler.  These actions continued after  the settlement agreement and were not, therefore, waived by the execution date of the agreement.  The Agreement, by its terms, settles all claims that occurred prior to the execution of the agreement – not those actions that occurred after the execution.  [App. 00197-00198; R.Doc. 39 at 7-8].  Also subsequent to the Agreement, the Agency agreed to attempt to effectuate a transfer.  Only the Agency can make such a transfer; a plaintiff cannot. The Agency through Wagner gave lip service to a transfer but never took any steps for it to occur.  The only evidence in the record of Wagner approving any

reassignment is the single email to Rene Rodriguez. [App. 0203 – 0204; R.Doc. 39 at 13-14]. Approval for this reassignment was solely dependent on Wagner to complete. He did not.

Separate from the reassignment offer made by Wagner but never followed through on by him, Ms. Martinez also approached her third line supervisor, Mr. Ash regarding a reassignment. This offer was separate from the one offered by Wagner. It too, came to naught.

Plaintiff was offered a 90 day detail. However, that detail was not a reassignment, merely a 90 day period of work in another area. [App. 00211; R.Doc. 39 at 21 ]. Plaintiff declined the 90 day detail as it was unclear how it would impact her pay and her ability to get a performance review. [App. 218; R.Doc. 39 at 28]. As supervisors are not give reviews to individuals over whom they have had less than 90 days supervision and Plaintiff's supervisors had changed many times, she was concerned that no one would be able to give her a review which would adversely impact her ability to move to another position under USDA policy. [App. 00218; R.Doc. 39 at 28].

The Agency argues that Martinez "withdrew the request to transfer" and that is the only reason a reassignment did not occur. This statement is false. Martinez withdrew her request to withdraw her informal complaint. Instead of withdrawing her informal complaint, Ada filed a formal complaint under the EEO procedures.

Martinez maintained her request for reassignment as part of her formal complaint's remedies.  The Agency's only action regarding transfer and reassignment was lip action.

Other Adverse Actions

Ada's performance evaluation was delayed by Wagner until December, causing her performance award to be delayed until February of 2019.  [App. 00219; R.Doc. 39 at 29].  Ms. Martinez discussed this in the Statements of Fact and the Oppositions to Defendant's statements of fact.  [App. 00219; R.Doc. 39 at 29].

Ms. Martinez has adduced sufficient facts to avoid summary judgment on her Disparate Treatment / Race Discrimination claims.  Summary judgment was improvidently granted.

C.     Ms. Martinez-Medina Established a Prima Facie Case of a

Racially and Sexually Hostile Environment

Ms. Martinez alleges three distinct forms of discrimination:  racial harassment, discrete discriminatory acts and retaliation.   In the complaint of discrimination underlying this lawsuit, Ms. Martinez describes a continuing pattern of harassment and also relies upon acts that were referenced in her 2017 complaint that settled in 2018.   Defendant would have the Court ignore all acts that occurred during or prior to the initiation and later settlement of the claims of discrimination found in case

number FSA-2017-00850, the 2017 complaint. The law does not require such blindness. The acts that occurred in 2018 and prior are admissible for other purposes and the Court should review them as evidence supporting Plaintiff's claim. "The existence of past acts and the employer's prior knowledge of their occurrence does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. An employee may also use the prior acts as background evidence to support a timely claim." National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). That they were settled does not mean that the Court is barred from considering them for other purposes. In this instance, those acts can be used to establish discriminatory animus as well as forming the basis for a retaliation claim.

Bradley v. Widnall, 232 F.3d 626, 633-34 (8th Cir. 2000) is cited by the Agency for the proposition that harassing conduct is limited to the instances of harassment that took place after a settlement agreement. Bradley does not support that legal theory. The Court found that the settlement at issue did not preclude consideration of pre-settlement conduct of discrimination in a later case "where the status of a current practice is at issue." Id. at 634. The court concluded that there is no bright line rule requiring such evidence be excluded. Id.

The Court may consider the settled claims – not for purposes of damages but as background evidence regarding the environment and as part of a continuing harassment claim.  Plaintiff's supervisors and co-workers subjected her to a hostile working environment based on race and sex, in violation of Title VII.  See Burnett v. Tyco Corp., 203 F.3d 980, 982 (6th Cir. 2000)(citing Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).  Racially hostile comments and harassing acts of a "continual" nature can create a hostile working environment. National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 114-115, 122 S.Ct. 2061, 2073 (2002).  Their very nature involves repeated conduct.  The "unlawful employment practice" therefore, cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years, and in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.   National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S.Ct. 2061, 2073 (2002).

 Harassment claims are based on the cumulative effect of individual acts.  Id. As the Supreme Court stated in Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 126 L.Ed.2d 295, 114 S.Ct. 367 (1993), the phrase "terms, conditions or privileges of employment [of 42 U.S.C. § 2003-2(a)] evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment which includes requiring people to work in a discriminatorily hostile or abusive environment."  A hostile work environment claim is comprised of a series of acts

that collectively constitute one "unlawful employment practice." 42 U.S.C. § 20035(e)(1). The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happens. It does not matter for purposes of the statute, that some of the component acts of the hostile environment claim fall outside the statutory time period. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. Morgan, supra, 536 U.S. at 115.

Of importance, as long as the employer has engaged in enough activity to make out an actionable hostile environment claim, "an unlawful employment practice has 'occurred,' even if it is still occurring. Subsequent event may still be part of the one hostile work environment claim and a charge filed at a later date and still encompass the whole." Id. Because a hostile environment claim continues for as long as the racially hostile acts occur and because racial harassment is considered one "discriminatory practice," a plaintiff may fully exhaust her remedies at any time the harassment occurs. National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S.Ct. 2061, 2073 (2002).

In this case, the contractors were fired that called Plaintiff spic and beaner, who shouted "tear down that wall" whenever she walked by and who named the database upon which she was working "Nacho Migration." The manager who

allowed those behaviors to go unchecked remained her manager. Jeff Wagner failed to take appropriate remedial measures for months after these outrageous acts occurred. Following the settlement of Ada's claims, Wagner considered Ada a troublemaker. He told Cynthia Towers that he was tired of her and wanted her out. [App. 00219; R.Doc. 39 at 29]. He also described Ada's complaints about the harassment she experienced as "Ada's issues." [App. 00219; R.Doc 39 at 29]. He personally intensified his own harassment of Ada. He piled on "bizarre" assignments that were out of her pay grade. [App. 00216; R.Doc. 39 at 26]. He continuously had her doing work above her pay grade, then he took credit for it. He would give her assignments; she would do all of the work, gather the documents, supporting research and put together the presentation. Wagner would then claim that work as his own. [App. 00214; R.Doc. 39 at 24]

Wagner treated Ada with condescension and disdain. Wagner sometimes referred to Ada in management meetings. There were innuendos about "girls and their hysterics" made to the other managers. [App. 00221; R.Doc. 39 at 21]. He threatened to write Ada up for being over one minute late for work; he did not do that to anyone else. [App. 00221; R.Doc.39 at 31]. Wagner made up false reports that Ada was insubordinate. [App. 00223; R. Doc. 39 at 33]. He told others that Ada was creating an uncomfortable and difficult work environment for the management team because of her complaints of discrimination. [App. 00223 ; R. Doc. 39 at 33].

Then, during a meeting called by Charlene Niffen, Ada's supervisor Carraig Stanwyck made a sexist comment. On December 12, 2018, Ms. Martinez was in a meeting called by Charlene Niffen with respect to job assignments. [App. 221; R.Doc. 39 at 21]. The meeting was cordial and without dissension. But then, Carraig Stanwyck, Plaintiff's supervisor, was asked about what Ada's role would be to best assist Charlene Niffen. Carraig responded that she could bring Charlene coffee. [App. 00221; R.Doc. 39 at 31]. Others in the meeting were appalled and commented on it. [App. 00221; R.Doc. 39 at 31].

Ada said she was going to write that up. Carraig turned and went to Wagner's office, as did Ada. Carraig arrived before Ms. Martinez so she waited her turn in the sitting area. She could hear Carraig and Wagner laughing and carrying on, mocking her. [App. 00222; R. Doc. 39 at 32]. During the conversation, Wagner told Carraig that he needed to "handle" Martinez and that she was just an incompetent woman. [App. 00222; R.Doc. 39 at 32]. He also made fun of Martinez to Carraig because she requested information on the proper chain of command. [App. 00222; R.Doc. 39 at 32].

Wagner continued his sexist and racist attitudes toward Martinez – Medina. It is Wagner's own discriminatory messaging that allowed the contractors to call Ms. Martinez beaner and spic for months on end and it is his continuing discriminatory messaging that allowed Carraig Stanwyck – who is on the autism spectrum and has

difficulty with social cues – to understand that the sexist / racist "joke" he made would be acceptable.  As for Ms. Martinez, she feels like she is being treated like a Hispanic maid or servant rather than an equal.  [App. 00222; R.Doc. 39 at 32].  The harassing behaviors that Wagner propagated by his own discriminatory animus are all ripe for consideration in this matter, even those that were previously settled, because they give full explanation as Wagner's racial and sexually discriminatory animus.

D.      Ms. Martinez Medina Established a Prima Facie Case of Retaliation

Defendant made no argument regarding Plaitniff's retaliation claims in its Motion for Summary Judgment.  The Court granted Summary Judgment pursuant to Defendant's motion, stating that Plaintiff had failed to establish that she suffered an adverse employment action and that the work environment was objectively hostile.  It appears that although the Court purported to dismiss Plaintiff's entire case, that the Retaliation claim remains unresolved.  There is no explicit finding in the Order that judgment was granted on the Retaliation claim.  [App. 00436; R.Doc. 42 at 20].

To the extent the Court determined that Plaintiff suffered no adverse job action as a result of the retaliation, that finding is in error.

Title VII prohibits retaliation against employees who initiate or participate in a proceeding or investigation that claims their employer violate Title VII. 42 U.S.c. §20003-3(a). Under the McDonnell Douglas burden-shifting framework, a plaintiff must demonstrate a prima facie case of retaliation. Hughes v. Stottlemyre, 506 F.3d 675, 678-79 (8th cir. 2007). A prima facie case of retaliation requires showing that: 1) the employee engaged in protected conduct; (2) reasonable employees would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action is causally linked to the protected conduct. Brenneman v. Famous Dave's of Am., Inc., 507 F.3d 1139, 1146 (8th Cir. 2007).

Upon a prima facie showing, "a presumption of retaliation arises and the burden of production shifts to the employer to advance a legitimate reason for the employment action." Hughes, 506 F.3d at 679. If the employer does so, the presumption drops out against the plaintiff. Id. The ultimate burden of persuasion remains with the employee to show the adverse employment action was motivated by intentional retaliation. Id.

The first element of Ada's case of retaliation has been met because she filed a charge of race / sex / national origin discrimination against the Agency. The second element, a materially adverse action, is also met. Plaintiff has alleged that the Agency required Plaintiff to work above her pay grade – doing GS 12, 13, and even 14 work as a GS9. Wagner, Plaintiff's second line supervisor – and the

40

person from whom all assignments emanated – gave Plaintiff bizarre work assignments and deadlines, he gave her work above her pay grade, he put increasing pressure on her for more, and he took all credit for the work that she performed. [App. 00214; R.Doc. 39 at 24]. During this time, Ms. Martinez – Medina ws neither promoted nor accreted to a GS13. She lost the pay for which she was entitled by virtue of doing the higher paid work at a lower rate. Additionally, he initially allowed Ms. Martinez-Medina to be reassigned at a lower pay rate, but refused that reassignment when he learned that she could keep her incentive pay with that reassignment. [App. 00217; R.Doc. 39 at 27]. He later agreed during informal counseling to reassign Ada to another area but never took any action of any kind whatsoever to effect that change.

When GS 13 employees retired, Ada Martinez was given their work but never their pay or the credit for the work she performed. Wagner allowed staff to dump their work on Ada when they could not get the assignments done themselves. Niffen, a lead in the A&A area, saw Ada being treated differently than everyone else. She was the only Hispanic female and the only one with prior a prior EEO complaint. Niffen believed that Ada was being singled out because of her prior complaints. [App. 00216; R.Doc. 39 at 26]. Because of the increased level of work being meted out after Plaintiff's first EEO, Ada believes that the extra and higher grade work without being paid for it is a form of retaliation for her prior EEO

activity.  The temporal proximity of the retaliatory actions provides support for her claims that these actions were motivated by retaliatory animus.  As for the first reassignment to Donald Butler, the process of reassignment began in April of 2018, prior to the signing of the settlement agreement.  However, the reassignment talks were ongoing even after the settlement agreement was signed and Wagner's refusal to even discuss the matter with Butler continued after the settlement agreement was signed.  The contract language of the settlement agreement specifically denotes waiver of discriminatory events prior to the execution of the agreement, but does not waive those occurring after.  [App. 00197-198; R.Doc. 39 at 13-14].  In this situation, the continuing attempts for Plaintiff to be reassigned to Butler's area and Wagner's refusal to contemplate it constituted retaliation.

During informal counseling, Wagner told the EEO officer Mr. Rene Rodriguez, that he had contacted another department about a reassignment for Ada in that department.  However, aside from that single email, no evidence exists in the record to show that Wagner took any further action.  [App. 00203-204; R.Doc. 39 at 42].  Plaintiff testified that she requested several transfers but Wagner denied them all.  [App. 00218; R.Doc. 39 at 42].

Instead of a reassignment, Wagner offered Ms. Martinez a 90 day detail to

Don Butler's division. That reassignment would have jeopardized Ms. Martinez's Pathways program that gave her a bump in pay and could have impacted her performance review, preventing her from applying for other positions. Under USDA policy, a supervisor can only review the performance of a supervisee if they have had at least 90 days of time to evaluate the supervisees' work. Because Plaintiff had so many supervisors, a 90 day detail would have impacted her ability to receive a performance review which in turn would have prevented her from applying for other positions. [App. 00206; R.Doc. 39 at 16]. Martinez believed the detail was just a way of getting rid of her because of her complaints. That was echoed by Cynthia Towers who knew that Jeff Wagner was tired of dealing with Ada and wanted her gone. [App. 00219; R.Doc. 39 at 29]. Wagner had refused to reassign Ada to the position to which she was invited to detail. His allowing her to detail to that position creates the inference that he did so merely to undercut her ability to receive a promotion and to place her in risk of losing her incentive pay. His refusing her the reassignment after learning she would keep her incentive pay buttresses this inference.

Wagner began making false allegations about Ada – including that she was insubordinate, that she had "issues" with which she needed help, that she was hysterical, and that she was incompetent. [App. 00219, 00222, 00223; R.Doc. 39 at 29, 32, 33, 46].

These behaviors have had a deleterious psychological effects on Ada Martinez. The stress takes away from her family, her children and her ability to perform her job. The situation has caused her so much anxiety – mentally, emotionally and even physically. She cannot sleep at night; she worries constantly; she has lost trust. It is adversely affecting other important aspects of her life. Likewise, if the agency had allowed Ms. Martinez the reassignment to Butler, she would have received her GS12 more quickly and would have been at a GS13 by now. All of these are adverse actions. [App. 00214; R.Doc 39 at 27].

The Agency has proffered only false reasons for its actions in this matter. False reasons are not legitimate business reasons for their actions and does not rebut Plaintiff's prima facie case of retaliation. Those false reasons include that Ada had acted "insubordinate" at the assignment meeting called by Charlene Niffen which prompted Carraig's response. [App. 00223; R.Doc. 39 at 33]. Wagner accused Ada of causing an "uncomfortable and difficult work environment for the management team" because she had to reassigned away from one supervisor already. [App. 00223; R.Doc. 39 at 33]. That reassignment was part of the EEO settlement process and his grievance concerning her reassignment is a part of the basis for her retaliation claim. [App. 00223; R.Doc. 39 at 33].

As for the final element, Wagner's actions were clearly race / national origin and gender based. His remarks establish that he believes in racial and sex based

stereotypes including that he referred to women generally and Ada specifically as being hysterical, having "issues" and being incompetent. [App. 00221-00222; R.Doc. 39 at 31-32] Evidence that a decisionmaker believes in stereotypes makes it more likely that a discriminatory factor played a part in defendant's decision making. Jones v. Cargil, Inc., 490 F.Supp.2d 978 (IA N.D. 2007). The Supreme Court has long recognized that unlawful discrimination can stem from stereotypes and other types of cognitive biases, as well as from conscious animus. Thomas v. Eastman Kodak Co., 183 F.3d 38, 59 (1st Cir. 1999).

In all respects, Plaintiff has established a prima facie case of retaliation that has not been undercut or rebutted by the Agency. Plaintiff's claims for retaliation should be heard by a jury.

CONCLUSION

Plaintiff has established through her own testimony as well as that of witnesses and the documents produced that she was subjected to ongoing harassment, disparate treatment, and retaliation, based on her race, sex, national origin and prior EEO activity. The Trial Court erred in granting summary judgment on those claims because he has made a prima facie showing of each. For the above and foregoing reasons, this Court should reverse and remand this matter

for trial.

Respectfully submitted,

/s/ Rebecca M. Randles    REBECCA M.
RANDLES  MO #40149
 RANDLES MATA, LLC
851 NW 45th Street
Suite 310
Kansas City, Missouri 64116
(816) 931-9901 (816)
     931-0134
rebecca@randlesmatalaw.com

ATTORNEY FOR
PLAINTIFF/APPELLANT

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Rebecca M. Randles
Attorney for Plaintiff/Appellant

## CERTIFICATE OF COMPLIANCE

COMES NOW Plaintiff/Appellant and, with regard to Plaintiff/Appellant's Brief, hereby states the document complies with the typeface requirements of Fed.R.App.P.32(a)(5) and the type-style requirements of Fed.R.App.P.32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 365 in 14-point Times New Roman, and excluding the parts of the document exempted by Fed.R.App.P.32(f), the document contains 11,456 words.

/s/ Rebecca M. Randles
Attorney for Plaintiff/Appellant